(A.R.D. 222)

UNION CARBIDE CORPORATION *v.* UNITED STATES

Entry No. 10417, etc.

First Division, Appellate Term

(Decided May 18, 1967)

*Otto Kinzel; Barnes, Richardson & Colburn (Joseph Schwartz* of counsel), associate counsel; for appellant.

*Barefoot Sanders*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for appellee.

Before OLIVER and WATSON, Judges, and WILSON, Senior Judge

WILSON, Judge: This is an importer's application for review of the decision and judgment of the trial court in *Union Carbide Corporation* v. *United States*, 55 Cust. Ct. 542, Reap. Dec. 11039, which affirmed the appraised values. Rehearing motion by plaintiff was denied (55 Cust. Ct. 594, Reap. Dec. 11061).

Appellant's assignment of errors includes one reading: "12. In denying appellant's Motion for rehearing." This alleged error is not supported by authorities, nor was it orally argued before the court, nor is it referred to in appellant's brief. Accordingly, this assignment is deemed abandoned. *Page N. Goffigon for Account of Charles R. Allen* v. *United States*, 32 Cust. Ct. 671, A.R.D. 42.

The imported merchandise is described in the eight entries under consideration in the above appeal for reappraisement as "wash wax sponges." They are used to clean automobiles. The sponges were exported from Canada between April 20 and May 23, 1961. The merchandise in question was entered at Niagara Falls, N.Y. Counsel agreed that the imported commodities do not appear on the final list,

93 Treas. Dec. 14, T.D. 54521, published by the Secretary of the Treasury, and, therefore, are dutiable under the 1930 Tariff Act, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

Appraisement was made in each entry at $0.634 [1] for each sponge on the basis of constructed value as defined in section 402(d) of the above-amended tariff act.

Appellant contends here, as it (plaintiff) did before the trial court, that the sponges are properly dutiable on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended, or, alternatively, on the basis of constructed value as defined in section 402(d) of said amended tariff act, and, in either event, at $0.275 each on exportations on and prior to May 10, 1961, and at $0.271 each on and after May 12, 1961. These claimed prices are the invoiced prices.

The pertinent provisions of the above-amended tariff act considered herein read as follows:

SEC. 402. VALUE.

\*  \*  \*  \*  \*  \*  \*

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*  \*  \*  \*  \*  \*  \*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

---

[1] All prices stated in this decision are in Canadian currency.

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*     \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, \* \* \*

\*     \*     \*     \*     \*     \*     \*

(g) TRANSACTIONS BETWEEN RELATED PERSONS.—

(1) For the purposes of subsection (c)(1) or (d), as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

\*     \*     \*     \*     \*     \*     \*

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; \* \* \*.

Appellant's contention as set forth in its brief, page 2, reads:

\* \* \* that the difference between the entered and appraised values was due to certain selling costs and other expenses which were incurred in selling in Canada, but which were not incurred in selling to Union Carbide Corporation in the United States. Hence under the rule of *United States* v. *Acme Steel Co.*, 51 CCPA 81, C.A.D. 841, the invoice price "fairly reflects the market value" and constitutes statutory export value; or alternatively that the invoice price constitutes statutory "constructed value."

Appellee's brief, page 9, states:

Appellee contends that the Court below was correct in holding that appellant failed to establish an export value for the imported merchandise in that it failed to prove that the price at which the merchandise was entered fairly reflects its market value. Further, it is

contended that the Court below was also correct in holding that the appellant failed to prove that the entered value is the proper dutiable value on the basis of constructed value.

The evidence of record and the invoices and other entry papers disclose that Union Carbide Canada, Limited, Consumer Products Division, Toronto, Ontario, Canada, is the manufacturer and seller of the involved sponges; that Union Carbide Corporation, New York, N.Y., is the importer of record for the account of Union Carbide Consumer Products Company at Philadelphia, Pa., and at Chicago, Ill., the ultimate importers. It is not disputed that these are "transactions between related persons" as contemplated by section 402(f), *supra*.

Plaintiff offered the oral testimony of two witnesses and introduced two exhibits in evidence. The defendant offered no evidence.

Plaintiff's exhibit 1 is a sample of a sponge in its condition as imported. The interior of the sponge is impregnated with various detergents and waxes. One side has a smooth or soft surface, while the other side which is dark blue was treated with an abrasive or rough material designed to remove thick mud and dirt more quickly from wheels and hub caps of automobiles. These sponges were exported in bulk in used cartons containing between 50 and 150 sponges. These used cartons were shipped to Canada by United States shippers who were not affiliated with any of the Union Carbide organizations. As shipped to Canada, they contained certain chemicals and sponging material which had not been impregnated.

Plaintiff's illustrative exhibit 2 is a so-called "blister packing" for sponges such as here involved. It is a cardboard display card with English and French advertising matter printed on both sides. A thick or hard plastic cover for the sponge is affixed to the display card. When sold in Canada to wholesalers, department stores, and certain other retailers, the display card with sponge and plastic cover therefor are placed in new cartons containing 24 such blister packed sponges.

Henry Lionel Tipple, employed as manager of new product development of the Consumer Products Division of the exporter and in other capacities for 26 years, testified that there were no other manufacturers of plastic impregnated sponges in Canada at the time here involved; that he was authorized to manufacture and market the product, and went to New York where he discussed the program and price with the manager of the Union Carbide Consumer Products Company. They agreed on a price of $0.275 each for the first 200,000 sponges. Thereafter, because of a reduction in price in the cost of one of the materials, the price for the other 300,000 was reduced to $0.271 each. These prices were f.o.b. Toronto, which is the principal market and the exporter's place of business. Such sponges were not offered in bulk to anyone else in the United States or Canada during the involved period. The sale

to the United States was an outright purchase without restriction of any kind, and the price was not controlled by the purchaser. The price was higher to Canadian purchasers than the price for the above 500,000 because the Canadian buyers numbered about 100 to 200 who purchased in smaller quantities in a total of 2,000 orders. In the opinion of the witness, the sale price to the United States fairly reflected the market value for export "Because it covered our production costs plus a profit."

Under cross-examination, Mr. Tipple testified that this product was developed in the United States and produced in Canada; that the United States company had some development costs and that a development fee was regularly paid to Union Carbide Corporation, which fee was taken into consideration in the instant sale. He stated that the $0.275 price took into consideration the estimated cost plus a 15 percent margin equal to just over 3 cents per sponge and that the cost of material is part of the balance. He also testified that sales in Canada were made at $0.79 of which 30 cents represented plant costs for the cost of materials and fabrication (R. 28). He did not know the cost of the blister packing.

John Robert MacArthur, plaintiff's other witness, who had been employed by the Canadian exporter for 9 years as manager of accounting and other accounting positions, testified in substance as follows: He is a chartered accountant in Canada, which is equivalent to a certified public accountant in the United States; he had had 20 years' experience as accountant and had studied cost accounting. He stated that the determination of costs of the involved sponges was prepared under his general supervision and that the cost records are maintained under his supervision; that he is familiar with them and obtained the cost of production of the items from such records for the periods to May 10, 1961, and thereafter, which he said were as follows:

|  | May 10, 1961, and prior | After May 10, 1961 |
|---|---|---|
| Materials | $163.98 per thousand | $159.98 per thousand |
| Fabrication | 10.03 " " | 10.03 " " |
| General Expenses | 53.71 " " | 53.71 " " |
| Containers and expenses to U.S. | 6.11 " " | 6.11 " " |
|  | 41.17 " " | 41.17 " " |
| Profit |  |  |
| Total | $275.00 " " | $271.00 " " |

Mr. MacArthur further stated that a general description of the expenses shown above would include maintenance charges, utilities, taxes, supervision, shipping, administration, and depreciation, and from an accountant's point of view, "I would say everything relative to the production and shipping of these products." He said that his "sales quotations are built upon the basis of estimated figures for a new product, but accountingwise, we keep everything on actual and what

accountants would call a full absorbed system." The witness also testified that there is no development cost included in the expenses because an agreement with Union Carbide Corporation in New York contains "a clause specifically excluding such items as this." This contradicts the testimony of the previous witness wherein he stated that a development fee was regularly paid. Mr. MacArthur further stated, if such development cost was to be included, that it would come to approximately $3 per thousand, thus *increasing* the general expenses of $53.71 by $3 per thousand and *reducing* the profit by the same amount. In his opinion, the selling price to the United States fairly reflects the market value for exportation to the United States although such sponges packed in a package such as exhibit 2 were sold in Canada at $0.79 each. He was asked "why" and testified (R. 42–43).

A.  Because there is an essential difference between the two markets as previously testified, the shipments under discussion here were of a special nature so that they received a bulk packing. There was no advertising costs. The advertising was direct, exclusively to the home market. The packaging in the United States, the one under discussion, was in bulk. The type of package such as Exhibit 2 is quite an expensive one, which was eliminated here and these differences do account for the seemingly differential in the selling prices.

Q.  What about the question of quantities, the difference in quantities, would that have a bearing on your opinion?—A.  Yes, most certainly. In fact, that this was a large two or three very large orders as opposed to many many small singular ones always increases the cost of the labor and there is another element, so far as domestic sales are concerned, these are not made up F.O.B. Toronto. The freight is very difficult to calculate because of the fact there are a great number going to all points of Canada, going coast to coast, but the ultimate is when the freight transportation comes into play.

Under cross-examination, Mr. MacArthur testified that the development costs were excluded solely by reason of the contract, but would otherwise have been included if dealings were with someone other than Union Carbide; that in such event the profit would be reduced. He did not know whether it was normal that a sale price be higher to others that a related company so as to increase the profit. He stated that the $0.79 price included a Canadian Federal sales tax of 11 percent and 2 percent cash discount.

By statute, 28 U.S.C., section 2633, "The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise." The plaintiff is under the burden to establish that the appraisement is erroneous and also establish its own claimed value, failing which the appraised value remains in full force and effect. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495,

citing cases; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593.

Appellant's primary contention relates to a claimed export value at the invoiced values. *If* established, it would represent the correct dutiable value for the imported merchandise as export value takes precedence over constructed value basis. Section 402(a) (1), (2), and (3) of the above-amended tariff act. See also *United States* v. *Acme Steel Company*, 51 CCPA 81, 87, C.A.D. 841. Hence the record, insofar as it relates to export value, will be first considered as well as the law applicable thereto.

The importer is a selected, exclusive purchaser, and a related person to the exporter as contemplated by section 402 (f) and (g), *supra*. It is thus necessary to ascertain whether the prices agreed upon fairly reflect the market value of the imported merchandise. The court must ascertain that fact from the evidence in the record rather than from the *belief* of the witnesses.

The record discloses that sales of identical sponges were made in Canada for home consumption in so-called "blister package[s]." These were packed in new cartons containing 24 to the carton, whereas shipments to the United States were made in used cartons, in bulk, packaged 50 to 150 sponges per carton. There were 100 to 200 purchasers for home consumption. They purchased small quantities in about 2,000 orders as compared to only one United States purchaser who bought 500,000 in what may be termed one order.

The question of the consideration, if any, to be given to evidence relating to sales for home consumption, i.e., to foreign values in determining export value for the same merchandise has been before this court and our appellate court in previous cases.

In *United States* v. *Acme Steel Company*, *supra*, at page 89, the court states:

We find ourselves in harmony with the view expressed by the majority that all sales in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise and that evidence of price, and hence of the value of goods in the foreign market, is relevant to the ultimate determination of the export value of imported merchandise within the ambit of section 402(b) of the Tariff Act of 1930, as amended, supra, in the case of sales to selected purchasers.

The trial court in the *Acme Steel* case, *supra*, relied upon the general statement contained in Senate Report No. 2560, 84th Congress, second session, to accompany H.R. 6040, which became the Customs Simplification Act of 1956, intended to eliminate foreign value as a basis for valuing imported goods for duty purposes. The trial judge in the *Acme Steel* case, *supra*, held that evidence as to conditions or practices in selling merchandise of the same kind in Canada for home

consumption "is not probative of any fact necessary to a determination of whether such merchandise was or was not sold 'in the ordinary course of trade' within the meaning of that term, as used and defined in the statute." *Acme Steel Company v. United States,* 48 Cust. Ct. 497, 500, Reap. Dec. 10135. The appellate term, one judge dissenting, disagreed with the view thus expressed. *United States* v. *Acme Steel Company,* 50 Cust. Ct. 529, 534, A.R.D. 152, and the Court of Customs and Patent Appeals expressed the view hereinbefore quoted. In the instant case, appellant also calls attention to the above Senate report 2560, *supra.*

The separate elements of costs of material, fabrication, containers and other expenses relating to sales to the United States, as well as general expenses therefor and the profit thereon, which aggregate $0.275 and $0.271, are shown, *supra.* However, similar elements of costs which constitute the selling price of $0.79 in Canada are not of record. Other than the statement by Mr. Tipple that $0.79 covers "just over 30 cents" for plant costs for material and fabrication (he did not know the cost of blister packing and the record does not show whether the cost for material includes the cost of blister packing), there is no proper basis for comparison of costs, general expenses, or profit in respect to the grossly varying selling prices. Without such comparison, a proper determination cannot be made that the export prices herein are "in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise." Section 402(f) (1) (B), *supra.*

In *United States* v. *John V. Carr & Son, Inc.,* 52 Cust. Ct. 599, A.R.D. 165, affirmed *Same* v. *Same,* 52 CCPA 62, C.A.D. 860, there was a price differential for export sales and for home consumption sales respectively between $33.60 and $42.50; $29.15 and $42; and $33.85 and $46. These differences were termed either as a marked difference or as considerably higher. In the case at bar, the differential is between $0.275 and $0.271, and $0.79, respectively, for export and for home consumption sales. In the *Carr* case, *supra,* foreign market values were held relevant for consideration, and the lower prices to the United States were held not to establish an export value under the statute here involved.

It may nevertheless be noted that the testimony of Mr. Tipple indicates that the cost only for material and fabrication for home consumption sponges was "just over 30 cents." This *exceeds* the total selling price to the United States of $0.275 or $0.271. The court may not disregard these facts of record. Demonstrably, therefore, this fact alone illustrates that the selling prices to the United States do *not* fairly reflect the export market value of the merchandise as contemplated by the above statutes. Under such circumstances, it is immaterial that *other* costs incurred and included in general expenses

in connection with home consumption sales are not also incurred or included in connection with sales for export to the United States. The court realizes, on the record, that certain costs for home consumption may not be applicable to sales for exportation to the United States, or may differ. This does not apply or relate to differences in cost of material or to the cost of fabrication of identical merchandise which is *sold* for less for export than the *costs* for both material and fabrication. Moreover, there is no indication of record that there is a variance in cost for these two items for export and for home consumption. It may not be properly argued that the cost of the "blister packing" might make up such difference because such "blister packing" is part of the cost of containers and is not material or fabrication. Nor may it be surmised, conjectured, or speculated that the export cost of materials and fabrication costs less than the home consumption cost of materials and fabrication for the reason that it takes only 2 days to manufacture these sponges according to the record during the period between April 20 and May 23, 1961. The record is not clear whether the 100 to 200 customers placed 2,000 orders during that period or at some other time.

Appellant's brief, page 13, assumes that the trial court rejected the invoice prices as "export value" because "there was no *breakdown* of the *specific amounts* of the difference between the expenses incurred in export sales and in the home market," citing the *Acme Steel* case (C.A.D. 841), *supra.* In the cited case, a witness testified that 30 percent was deducted "from the home consumption price to allow for *expenses* incurred in selling in the Canadian market, such as selling, warehousing, advertising, freight and tool repair service." The selling price in that case to the United States purchaser, "represented the Canadian domestic price in carload lots less 30 percent." It was stipulated in that case that the only item of the appraised "value in dispute was that of general expenses * * * that the appraised value at the entered unit values, plus 27.40 per centum, represents part of the difference between the home market price and the export price to the United States."

The facts in the instant case are substantially different from the facts in the *Acme Steel* case, *supra.* Here the selling price to the United States does not represent a Canadian domestic price in carload lots less a percentage or any amount for expenses as above enumerated. In *Acme Steel*, it must be presumed on the record there made that the cost of materials and the cost for fabrication remained the same for home consumption sales as well as for sales to the United States. In the instant case, on the record as here made, it is obvious that the costs for material and fabrication of 30 cents for home consumption sales *exceeds* the total selling price to the United States of $0.275 and $0.271. Therefore, whether a further "breakdown of the specific

amounts of the difference between the expenses incurred in export sales and in the home market" was necessary or should include development costs becomes inconsequential. We, therefore, agree with the trial court that on the record the importer failed to prove that the merchandise was freely sold or offered for sale in Canada to all purchasers at wholesale for exportation to the United States at a price which fairly reflected the market value of the merchandise.

Appellant's alternative contention relates to a claimed constructed value under section 402(d), *supra*, at the invoiced values. Appellant's brief, page 18, states:

We think it is fair to assume that the appraised value of 63.4 cents per sponge is based upon the fact that wash-wax sponges were sold for home consumption in Canada at 79 cents from which the appraiser apparently made certain undisclosed deductions to arrive at the appraised value of 63.4 cents. We submit that under the statute, and in common sense, the appraiser was clearly wrong.

It may be pointed out that the Government is not required "to prove that the appraised value was proper, until or unless the importer has shown said appraisement to be erroneous *and* established a different value in place thereof." *Kenneth Kittleson* v. *United States,* 40 CCPA 85, 89, C.A.D. 502. Failure so to do continues in effect even an erroneous appraisement. *Kobe Import Co.* v. *United States, supra.*

The record does not support the assumption that the appraised value of $0.634 was based upon the fact that wash wax sponges were sold for home consumption in Canada at $0.79. Nor does the record disclose that the appraiser "made certain undisclosed deductions to arrive at the appraised value * * *." The trial court states, and we concur, that there is "no evidence which points up how the appraiser arrived at his determination" of constructed value.

Constructed value is the sum of the cost of materials and of fabrication (section 402(d)(1)), and an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind by producers in the country of exportation, for shipment to the United States (section 402(d)(2)), and the cost of all containers and coverings of whatever nature, and all other expenses incident to placing the merchandise undergoing appraisement, packed ready for shipment, to the United States (section 402(d)(3)).

The evidence discloses that a development fee of $3 per thousand was by contract not included in the expenses but would be included if dealings were with United States purchasers other than Union Carbide Corporation, i.e., with unrelated companies. One of importer's witnesses stated that he did not know whether it was normal to increase the profit margin by increasing the selling price when sales for exportation are made to unrelated companies. The general

expenses of $53.71 would, accordingly, be increased at least by $3 per thousand. Furthermore, as shown, *supra*, the cost of materials and of fabrication in home consumption sales is greater than the *total* sales price for exportation to the United States. The foregoing is sufficient to conclude that the transaction between the exporter and importer herein may be disregarded in accordance with section 402(g) (1) and (2), *supra*. This is especially so as there is no evidence "available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2)."

Appellant's brief, page 20, asserts that Mr. MacArthur's figures are based upon the *only* sales in the *export* market, which infers that sales in the foreign market for home consumption need not be considered. This contention is contrary to the court's decision in the *Carr* case, *supra*. It is also argued that the best evidence available, if there be no transactions other than to related persons, is the evidence as to the sales for exportation herein as "all the elements of constructed value would not have exceeded the invoice price if the goods had been sold to persons having no connection whatever with Union Carbide Canada Ltd." This does not seem to be entirely correct for Mr. MacArthur testified (R. 44–45):

X Q.  Assuming also, Mr. MacArthur, that you were dealing with someone other than a related company such as Union Carbide of the United States, I will refer to it as that. Would you say that your profits would be greater than you testified to here?—A.   No. If anything, I would say it is smaller because the only difference between this particular sale is the item of development which would be charged against the assumed sale thereby reducing the profit.

X Q.  I take it your answer is confined to the situation where the price would remain the same?—A.   That is correct.

X Q.  In determining the salable price to a company other than one related to your company, would not it be normal to increase the price so that your profit would be more?—A.   I don't know. This is not my responsibility.

The trial court rejected the invoice prices under the "related parties" rules "for the reason that they do not reflect the elements of a fair export market value of the subject merchandise for constructed value purposes." We concur in the foregoing conclusion. The presumptively correct appraised constructed value has not been overcome on the record herein.

Accordingly, on the record herein, the court finds as facts:

1.  That the imported merchandise consists of impregnated wash wax sponges exported by the manufacturer and seller, Union Carbide Canada, Limited, Consumer Products Division, Toronto, Canada, between April 20 and May 23, 1961.

2. The importer of record is Union Carbide Corporation, New York, for the account of Union Carbide Consumer Products Company at Philadelphia, Pa., and Chicago, Ill., which are the ultimate importers.

3. The merchandise does not appear on the final list, 93 Treas. Dec. 14, T.D. 54521, published by the Secretary of the Treasury.

4. Appraisement was on the basis of constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

5. The merchandise was sold for exportation to the United States exclusively to the importer, a selected purchaser at wholesale, and a person related to the exporter of the merchandise as defined in section 402 (f) and (g) of said amended tariff act.

6. The merchandise is a new product, developed in the United States and produced in Canada by the exporter. There was no other Canadian manufacturer of merchandise of the same general class or kind during the period in question.

7. Plaintiff below, appellant herein, claimed an export value in the invoiced amounts of $0.275 and $0.271, respectively, for exportations on and prior to May 10, 1961, and on and after May 12, 1961, as defined in section 402(b) of said amended tariff act or the same amounts alternatively as constructed value, *supra*.

As conclusions of law, on the record, the court finds:

1. The appellant has failed to establish that the invoiced values represent the price at which the merchandise was freely sold or offered for sale in Canada to all purchasers at wholesale for exportation to the United States, or that said price fairly reflected the market value of the merchandise.

2. The plaintiff, appellant herein, has failed to establish that the invoiced prices represent the cost of materials and fabrication or the general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind made by producers in Canada for shipment to the United States.

3. The evidence does not overcome the presumptively correct appraised value.

4. The appraised value, on the basis of constructed value, section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, remains in full force and effect.

5. The judgment of the trial court is affirmed.

Judgment will be entered accordingly.