UNITED STATES *v.* F. VIETOR & ACHELIS (No. 2951[1])

United States Court of Customs Appeals, May 7, 1928

*Charles D. Lawrence*, Assistant Attorney General (*Peter A. Abeles* and *Oscar Igstaedter*, special attorneys, of counsel), for the United States.
*B. A. Levett* for appellees.

[Oral argument February 7, 1928, by Mr. Igstaedter and Mr. Levett]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court in reappraisement No. 53635–A. The merchandise involved consists of black velvet ribbons manufactured in Germany, known

[1] T. D. 42767.

as pon 90, and imported in several widths. It is composed of a cotton pile, cotton warp, cotton weft, silk-satin back, and artificial silk edges. It was entered at its United States value, and appraised at the foreign value, less 20 per centum, of a ribbon identified in the record as "No. 9," and sold in the markets of Germany for consumption there.

On the trial before the associate justice, sitting in reappraisement, the importer called as a witness one Harry S. Radcliffe. He is a partner in the firm of Trafford Company, for whose account the merchandise was imported. He stated that the imported merchandise was manufactured for the importer exclusively, and was not offered for sale in the German markets for consumption there, nor for export to the United States; that quality No. 9 ribbon was sold in the German markets; that it was not sold for export to the United States; and that it was the cheapest quality of ribbon sold for consumption in Germany. He said that quality No. 9 differed from the imported merchandise in the following particulars: "There is quite a technical difference. I had better explain it. The difference is in the material and in the quantity of material used in the seams, edges, pile, warp, and weft"; and that the materials used in the manufacture of quality No. 9 were superior to those used in the imported ribbons. In this connection he said:

A. Well, for the weft for the home article, article 9, they use a grade of cotton known as No. 50r/1 medio, and for pon 90 they use No. 40r/1 medio for the four-line width, and for the wider widths they use No. 36r/1 medio. In the warp for pon 9 they use cotton No. 100r/2 twist, and for pon 90 they use No. 80r/2 twist. For the pile of No. 9, for the home article, they use No. 60r/2 soft S. J. comb., and for the pon 90 pile, in the four-line widths, they use No. 40r/2 soft, and for the wider widths they use No. 60r/2 plain Louis. For the satin— I might say that the warp, weft, and pile of the material I have spoken of so far is cotton. Now, for the satin they use organzine silk 28/30 denier, and for pon 90 they use organzine silk 19/21 denier. For the edges of the home article they use also organzine silk 28/30 denier, and for the edges of pon 90 they use artificial silk 100 denier.

He stated that, according to the books of the manufacturer, the cost of production of quality No. 9 in August, 1925, was 43 per centum higher than the imported ribbons. He qualified this statement, however, by saying that the values of the materials used in the manufacture of ribbons would vary to such an extent that "a week later that information wouldn't be of any value." He explained that his company, prior to 1925, had imported No. 16 ribbon, a quality higher than No. 90 and lower than No. 9, but that, due to the advancing costs, it was deemed advisable to have a cheaper quality manufactured. As a result, the manufacture of quality No. 16 was discontinued and quality No. 90 substituted therefor. He did not

testify as to the use of the ribbons; however, he did say that, because of the difference in quality and value, they were not commercially interchangeable.

The Government offered evidence for the purpose of establishing that qualities Nos. 9 and 90 were commercially interchangeable; although, due to the difference in the quality of the materials used in manufacture, the cost of production of No. 9 was 20 per centum higher than the cost of No. 90.

The court below was called upon to weigh the evidence introduced in the case. It did so, and held in favor of the importer. Had the evidence introduced by the importer been substantial, and had it met all of the issues presented by the appeal to reappraisement, we would be required under the law to affirm the judgment.

We have studied the record with care and have failed to find any evidence to establish that merchandise *similar* to that imported was not freely offered for sale to all purchasers in the principal markets of Germany *for exportation to the United States by some manufacturer or organization.*

With the assistance of the report of the Government agent (Exhibit 3) the importer was aided in showing that, unless the imported merchandise was similar to quality No. 9, no merchandise similar to that imported was sold for consumption in Germany. All of the testimony given by the witness for the importer was predicated upon the following statement made by him at the outset of his direct examination:

Q. And you are familiar with the market in Germany, are you, for this class of silk—velvet ribbons?—A. As concerns our own mill.

He was familiar with the output and sales of the mill he represented, but there is not the slightest indication from his testimony that he was familiar with the German markets, or that he intended to be understood as testifying concerning ribbons other manufacturers or organizations were selling for consumption in Germany. However, the following statement contained in the Government's Exhibit No. 3 remedies this defect in the importer's case with respect to the question of foreign value:

Of the various numbers prescribed for sale inland, 16/300 is nearest to No. 9 in the association's list.

The record discloses that quality 16, which is not now being manufactured, is of higher value than No. 90, but of less value than No. 9. So, for the purpose of determining whether merchandise similar to that imported was sold for consumption in Germany, it was proper for the court below to confine its consideration to Nos. 9 and 90. However, our study of the record does not disclose that either party has supplied the necessary facts, if any such existed, to

show that merchandise *similar* to that imported was not sold in Germany *for export to the United States.*

It should be remembered that section 402 of the Tariff Act of 1922 provides that the United States value shall be the dutiable value of merchandise when "neither the foreign value *nor the export value can be ascertained* to the satisfaction of the appraising officers." (Italics ours.) The same section defines export value as follows:

Sec. 402. (c) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. If in the ordinary course of trade imported merchandise is shipped to the United States to an agent of the seller, or to the seller's branch house, pursuant to an order or an agreement to purchase (whether placed or entered into in the United States or in the foreign country), for delivery to the purchaser in the United States, and if the title to such merchandise remains in the seller until such delivery, then such merchandise shall not be deemed to be freely offered for sale in the principal markets of the country from which exported for exportation to the United States, within the meaning of this subdivision.

The question of whether the merchandise had an export value was one of the issues raised by the appeal to reappraisement. In view of the failure of the importer to meet this issue by introducing evidence in regard thereto, the court below should have reversed the judgment of the associate justice and remanded the case for further proceedings. Accordingly, we must hold that there is no substantial evidence to sustain the findings of the court that the merchandise had no export value. For the reasons stated, we have not considered the question of similarity between the imported merchandise, No. 90, and that sold for consumption in Germany, No. 9. In this connection, however, we desire to call attention to our decision in the case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. —, T. D. 42714, wherein the question of what constitutes "similar" merchandise was discussed.

The merchandise was appraised by the local appraiser at the value of quality No. 9 ribbon, less 20 per centum. This is an appraisement based upon, rather than at the value of, "similar" merchandise, and is contrary to the provisions of section 402 of the Tariff Act of 1922 *United States* v. *Irving Massin & Bros.*, *supra.*

The judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.